**LYNE et al. v. COON.   (No. 8156.)\***

(Court of Civil Appeals of Texas.  Galveston.
April 6, 1922.  Rehearing Denied
April 27, 1922.)

**1. Adverse possession ⟨key⟩114(1)—Evidence held to support finding of adverse possession.**

In trespass to try title, evidence *held* sufficient to support the jury's finding of adverse possession of defendant's predecessor.

**2. Appeal and error ⟨key⟩1002—Jury's verdict on conflicting testimony cannot be disturbed on appeal.**

In trespass to try title, where the evidence as to when land was fenced, and whether the fences were continuously kept up by a land company, so as to exclude the stock of others, was conflicting, the matter was for the jury, and their finding cannot be disturbed on appeal.

**3. Evidence ⟨key⟩14, 588—Witness' statement that he built fence within three years after a party took possession is not destroyed by inability to remember the year.**

The inability accurately to remember dates, and hesitancy under cross-examination, especially with illiterate witnesses, to name the exact date of a past occurrence, is a matter of common knowledge, and a witness' statement that he built a fence inclosing the land in controversy within three years after a certain party took possession of it is not destroyed by a witness' further statement that he cannot remember the year.

**4. Adverse possession ⟨key⟩114(1)—Evidence held to sustain findings for defendant on issue of adverse possession of his predecessor in title.**

In an action in trespass to try title, evidence *held* to sustain finding in favor of the defendant on the issue of limitation of 10 years accruing under the possession of one of his predecessors in title and the executors of such predecessor while acting as defendant's agents and tenants at will.

**5. Adverse possession ⟨key⟩25—Express contract of lease or rental is not essential to holding of adverse possession by one person for another.**

An express contract of lease or rental is not essential to the holding of possession by one person for another, and, if one who has entered land including a parcel claimed by another recognizes and acknowledges claimant's title, and there is an understanding between them as to the use thereof, and claimant thereafter permits or suffers the occupant and those succeeding to his estate to occupy the parcel, they are estopped to deny claimant's title in an action in trespass to try title.

**6. Adverse possession ⟨key⟩89—Finding on issue of five years' limitation cannot be sustained in the absence of sufficient evidence of payment of taxes.**

In trespass to try title, jury's finding in favor of the defendant upon the issue of five years' limitation accruing under certain of defendant's predecessors in title cannot be sustained where there is insufficient evidence of the payment of taxes by the defendant or his predecessors during such occupancy. ,

Appeal from District Court, Brazoria County; M. S. Munson, Judge.

Action by W. C. Lyne and others against R. S. Coon.  Judgment for the defendant, and the plaintiffs appeal.  Affirmed.

W. T. Williams, of Austin, Elmer P. Stockwell and A. R. Rucks, both of Angleton, J. H. Underwood, of West Columbia, and Oliver J. Todd, of Beaumont, for appellants.

Meek & Kahn, Huggins, Kayser & Liddell, and Presley K. Ewing, all of Houston, for appellee.

PLEASANTS, C. J.  This is an action of trespass to try title, and for damages brought by appellants against the appellee.  The land involved is the south half (2½ acres) of what is known as block No. 15 of the Hogg subdivision, and as claimed by appellants is a part of a tract of 163 acres on the Josiah H. Bell survey, conveyed by said Bell to Ann C. McKinstry by deed of date April 27, 1837.

The land is in the West Columbia oil field, and there are several producing oil wells thereon.  Plaintiffs' petition seeks recovery of the title and possession of the land and the value of the oil taken therefrom by the defendant.  There is no issue on this appeal as to the quantity and value of, the oil taken from the land.

The answer of defendant, in addition to a plea of not guilty and pleas of limitation of three, five and ten years, pleads title through a lost deed from Ann C. Harrison (formerly Ann C. McKinstry) and her husband, Green H. Harrison, to R. M. Forbes or C. R. Patton under whom defendant claims title by a regular chain of conveyances.

The trial in the court below was with a jury, to whom the case was submitted on special issues.  Upon return of the jury's findings, judgment was rendered thereon in favor of the defendant.

The evidence shows that the 163 acres of land, of which the land in controversy is claimed by appellants to be a part, was conveyed to Ann C. McKinstry by Josiah H. Bell, the original grantee, on April 24, 1837.  Thereafter, on January 14, 1841, Ann C. McKinstry married G. H. Harrison, and she and her said husband both died at some time prior to 1870.  By her last will, which was duly probated in Galveston county in December, 1870, she devised to her cousin, Susan M. Lyne, "five hundred acres of land," and to her friend, George W. Peete, whom. she named independent executor of the will, she bequeathed the sum of $500.  All the

remainder of her estate, both real and personal, she directed her executor to sell, and, after paying her debts and satisfying the previous bequests, to pay the balance of the proceeds to the said Susan M. Lyne and her son, William Lyne, share and share alike. Acting under this will the executor conveyed all of the lands belonging to the estate to Susan M. Lyne except four small tracts which are not here involved. This conveyance to Susan M. Lyne was made subject to any rights which her son, William Lyne, might have therein under the provisions of the will. There is no evidence that Susan M. Lyne ever received any part of "the five hundred acres of land" devised to her, unless the 163 acres before described was or should be applied to the satisfaction of said devise. Susan M. Lyne died March 5, 1897, leaving the appellant, W. C. Lyne, her only child, her sole heir. After the death of her first husband, which occurred in November, 1861, Susan M. Lyne, on the 29th of October, 1884, married Samuel Snyder, and remained his wife until her death.

The other appellant herein claims under W. C. Lyne.

This suit was filed on November 3, 1919. In March, 1844, Ann C. Harrison, joined by her husband, G. H. Harrison, signed and delivered to R. M. Forbes a bond for title to 163 acres of land conveyed to Ann C. Harrison, formerly Ann C. McKinstry, by Josiah H. Bell, on April 24, 1837. This instrument, which includes in its obligations to make a perfect title to the lands therein described another tract of 550 acres, recites a cash consideration of $1,332, and shortly after its date was recorded in the deed records of Brazoria county. There is no certificate showing the separate acknowledgment of Mrs. Harrison to this bond for title.

In 1854 R. M. Forbes conveyed the 163-acre tract to C. R. Patton, who owned a plantation of several thousand acres which this 163-acre tract adjoined. Patton had a race track on the land, and used it for pasturage purposes prior to the war between the states, and it has been known as part of the old Patton plantation ever since that time. In July, 1869, the administrator of Patton sold this land, with the balance of the Patton plantation, to J. Q. Jackson.

In August, 1869, Jackson conveyed the west half of the 163-acre tract to W. F. Arnold, who lived thereon continuously up to the time of his death, which occurred a few years before this suit was filed. The balance of this tract, with the other lands comprising the Patton plantation, was conveyed by Jackson to W. J. Hutchins on August 2, 1867.

In April, 1870, Hutchins conveyed to Moses Taylor, who in turn, on March 26, 1876, conveyed to the Texas Land Company. This company, on the 29th of March, 1878, made a contract with Capt. T. B. Yale for the conveyance of the Patton plantation, including the land in controversy. This contract also provided that Capt. Yale should manage the plantation for the grantors for the balance of the year 1878. The land was conveyed to Yale under this contract on January 2, 1880. In December, 1882, Yale conveyed the property to the New York & Texas Land Company.

On May 23, 1901, the New York & Texas Land Company conveyed it to J. S. Hogg, who thereafter subdivided a portion of the property into 5-acre lots or blocks. Lot No. 15, containing 5 acres, was sold by Hogg to J. C. Underwood in September, 1901. Underwood conveyed the south half of this lot to S. W. Gilbert, who in turn, on April 6, 1903, conveyed it to appellee.

No claim to the property was ever made by Susan M. Lyne nor any one claiming under her until shortly before this suit was filed.

In answer to the special issues submitted to them, the jury found against appellee's claim of title under a lost deed from Ann Harrison to R. M. Forbes or C. R. Patton. They further found that the New York & Texas Land Company held peaceable, adverse possession of the east half of the 163-acre tract before mentioned, cultivating and enjoying same, and claiming ownership thereof for a continuous period of ten years, beginning prior to the 29th day of October, 1884, and that said company also had peaceable, adverse possession of this land, cultivating, using, and enjoying same, and claiming ownership thereof under deeds duly registered, and paying all taxes thereon as they accrued, for a continuous period of five years, beginning prior to October 29, 1884.

They further found that the defendant Coon, through J. S. Hogg and those succeeding to his estate, held peaceable and adverse possession of the property, using, enjoying, and claiming ownership thereof, for a period of ten consecutive years after September 1, 1905, after deducting the period from March 3d to May 9, 1906, and that the defendant, through Hogg and the representatives of his estate, held adverse possession of the land, cultivating, using, and enjoying the same, and claiming ownership thereof under a deed duly registered, and paying all taxes thereon as they accrued, for a consecutive period of five years after September 1, 1905, and before the filing of this suit, after deducting the period between March 5 and May 9, 1906.

Upon the issue of boundary raised by the evidence and submitted to them the jury found that a portion of the 2½ acres involved in this suit was not on the Bell league.

Appellee claims that under the will of

Ann C. Harrison, Susan M. Lyne and appellant, William C. Lyne, became equal devisees of any interest Mrs. Harrison might have had in the land in controversy, and therefore, if there was limitation of five or ten years for any period in favor of the New York & Texas Land Company, the claim of W. C. Lyne would be barred. The trial court also submitted this issue to the jury, and the findings thereon were in favor of appellee.

Under appropriate assignments of error appellants complain of the charge of the court submitting to the jury the issues of limitation and the issue of boundary set out, on the ground that the evidence is insufficient to raise any of these issues, and also complain of the findings of the jury upon these issues on the ground that each of such findings is against the great weight and preponderance of the evidence.

[1] We think the evidence is clearly sufficient to raise the issue of the adverse possession of the New York & Texas Land Company, as found by the jury, and that neither of these findings is so against the great weight and preponderance of the evidence as to authorize this court to disturb the verdict.

[2] The evidence shows that the east half of the 163-acre tract of which the land in controversy is a part was fenced under the directions of Capt. Yale after he took possession of the Patton plantation. As before shown, he entered into a contract with the Texas Land Company for the purchase of the plantation in March, 1878, and this contract provided that he should manage the plantation for the balance of that year. The deed to him was executed in January, 1880, and in December, 1882, he conveyed the property to the New York & Texas Land Company.

K. F. Hagemier, witness for plaintiff, testified:

"I was acquainted with Capt. Yale. I first got acquainted with him in 1879. I was born in 1863. In 1879 and 1880, I lived a part of the time in Columbia and a part of the time with Capt. Yale; he lived on the Patton place. I think he began living there in 1879. He lived there continuously from 1879 to 1899. I stayed in the yard for the Captain. I was familiar with the plantation."

As to when this land was fenced, Houston Williams, a negro, who built the fence for Capt. Yale, testified:

"I know all the land that lays between the Captain and Mr. Arnold. I fenced that 80 or 60 tract, whatever it is supposed to be, that lies east of the Arnold tract, for Capt. Yale. It is a long time back yonder. I remember the flood of the Brazos river that you say took place in 1885, but the date I don't. I remember that that fence was built before that. That fence was put there the next year after Capt. Yale took charge. I disremember now what date of the year it was. I put that up on a contract, at 15 cents a pound. After I built the fence the Captain used the pasture for mules and horses. As to the character of the fence that I built—he paid me 10 cents a post to cut posts 7½ feet long. He had me to make them as near heart as I could get them—stout—2½ feet in the ground and 5 feet out; very sorry post I had to cut it out. I had to do just exactly what he said or I couldn't get anything. I had to toe the mark or I couldn't get a settlement. That was a barb wire fence, with eight wires. It starts at the lower corner of Mr. Arnold's, and comes to Mr. Gupton's, and takes in the biggest portion of the big wells. It takes in the oil field; it did, until they tore that fence down. All that oil field stands on the inside of that fence I built up, and pretty near all of it, the biggest bulk of it is inside. Capt. Yale kept that fence up pretty near all the time he was there, and after the Governor came he did the same. I stayed right there. I had to go out and ride the fence once a week. I was there when the Governor came, and after he came and after that Mr. Nash he come down and put some cattle, horses, and hogs in there, and he sold out to Mr. Damon, and I still remained there."

## On cross-examination he testified:

"I couldn't remember now when I built that fence at all. It was about two years after Capt. Yale moved on the place when the fencing taken place; that's my closest remembrance. I heard Mr. Joe Ogburn testify the other day. When I built that fence to the east of the Ogburn tract, I don't remember Mr. Joe being there. I contracted with Capt. Yale. I can't exactly get whether Mr. Joe was on the place, or whether.I built the fence before he came. I know he didn't have anything to do with my work at all.

"I don't know that the first wire fence that was ever put up in that county was on the Underwood pasture in 1885. There wasn't any wire fence put up in that community before 1885 that I knows of. I don't know what year it was that the fence west of the house between there and the Arnold place was built. I don't know that it was built in 1887 as a matter of fact. I don't know what year. I don't know that it was not built in 1887. I can't fix the year when that fence was built, whether it was 1887, 1885, 1884, or 1883. As far as picking out any particular year, I can't do that. My best recollection is that Capt. Yale had been on the place one, two, or three years when I built the fence. They worked me so many places I don't remember now what I was doing the first year I was there. The second year the stock was there, and I chopped for him, and they taken me out of the field and put me in the yard. They worked me all about. The second year I was working on the plantation, on both sides of the creek. There was nothing particular that happened that year, to my remembrance. I don't know exactly what I did the third year. I can't remember those years. I don't remember about the fifth or sixth years; that far back I don't remember; it is dark. I built that fence the third year. I don't know when I built it. I built it after Capt. Yale came there. I don't know how

many years it was built after he came there. My best recollection is it was just about three years after the Captain came there. That is just about as close as I can get to it."

In respect to keeping up the fences he testified:

"That fence, she began to go down three years ago; tried to hold it up three years ago, but after they got to work there they wouldn't stand for it. As far as hanging a gate they would take it down, wire and all. You can't keep a fence there; that is when they found oil. I kept that fence up from the time Capt. Yale went there. No kind of gate in the world will hold then when they go to work and find oil."

Wylie Lewis, another negro, who was 72 years old at the time of the trial; after testifying that he had been familiar with the Patton plantation since he was 16 years old, and that there was a race track on the land in controversy before the war, further testified:

"I know when Capt. Yale come on the place. Two years is my judgment as to how long Capt. Yale was there before he began to build those fences; it was not three years. He had stock there. The place was kept up pretty good. I would pass through the plantation pretty often, and the old man used to get after me about shutting the gates. I told him I always did shut the gates. He was mighty cautious about going through his plantation to keep his gates shut."

Foster Johnson testified:

"I know every bit about Capt. Yale having fences built and repairing fences. I was there when he built the first fence. The first wire that was ever fotched down to West Columbia, Capt. Yale fotched it. I was there on our place working at the Patton place three or four years before he began to build his first fence. There were people there before I was; they can tell you more about it then me. I know what fence you pass to put his mules in; he had about 200 mules to work the place. I don't think Captain Yale was there before he began fencing; he was a man who wanted everything fenced up; he was a man who wanted everything inclosed; he didn't want nothing outside. * * * The pasture never was vacant; up until the last year stock was in that pasture during all of that time. The place never has been vacant, but what some of the stock worked on the place in there all the time. That stock run in there by Mr. Will Hogg's permission. He had tenants on that plantation all the time. He has got tenants now, but me and Ed and Henry moved away last year."

The witness King testified:

"I am acquainted with Capt. Yale. From the time I first went to Mr. Arnold's in 1889 the fence immediately east of the Arnold place, between the two tracts, was kept up. That fence had eight wires, and was still up in 1916. During the time I lived there the land inside of that inclosure east of the Arnold was a hog

pasture. It was used during Capt. Yale's days as a hog pasture, and after that it was a cattle pasture. There was oil started there in 1908, three and two, along there somewhere, and in 1918 they brought in the first big well. Those fences that Capt Yale built and the Governor repaired, east of the Arnold, were broken or destroyed when this big well was brought in, in the winter of 1918–1919. They had been raising stock on that land up to that time, and the fences must have been kept up. * * * There was a lane between the Arnold place and the land lying immediately east, that was fenced; one fence was owned by Mr. Arnold and one by Capt. Yale. Both the fences were off the dividing line. Mr. Arnold had one fence, and Capt. Yale had the other. At the time Mr. Arnold's fence was moved they did not put the fence on the dividing line. The fence never has been moved. The fence on Gov. Hogg's place wasn't removed; just the fence on the Arnold tract was removed. * * * The land immediately east of Mr. Arnold is an oil field; the fence built there originally by Capt. Yale was broken the winter of 1918–1919."

T. L. Smith testified:

"I was acquainted with Capt. Yale. At the time he came into this country I was engaged in mercantile business. He moved on to this place along the first part of the '80's, or the latter part of the '70's. I don't remember what year —the first of the '80's or the latter part of the '70's. My recollection is he made some sort of trade, and was going to buy the plantation, but it was afterwards rescinded. Afterwards he acted as agent for the New York & Texas Land Company, is my understanding. The record is that in 1882 he made a conveyance back to the New York & Texas Land Company. In 1882 I was acquainted with him; met him most every day up to the time he left there. From about 1882 until he left the plantation I don't know whether I heard him make the statement that he was owning it, or how he held it, but we had business dealings in which he represented himself as the agent of the New York & Texas Land Company. That is my recollection, that he represented himself as agent for the New York & Texas Land Company, Limited. He drew checks and signed them, 'T. B. Yale, Agent.' "

The evidence shows that the east half of the 163 acres was assessed for taxes by the New York & Texas Land Company each year from 1885 to 1901 inclusive. No tax receipts were introduced in evidence, but the deputy tax collector of Brazoria county testified:

"My rolls indicate that those taxes were paid each year as they matured. From 1885 to 1890 I didn't get the exact date they were paid, but they never appeared on the delinquent rolls, so we rather supposed they were paid each year. From 1891 to 1901 I have the date they were paid. They never went delinquent in 1892. From 1895 to 1890 they never appeared on the delinquent rolls, but I never got the dates; that would indicate they were paid without delinquency."

No taxes were ever paid on the land by appellants.

The appellants introduced evidence showing that the land was not fenced until 1887, and that the fences inclosing the land were not continuously kept up by the New York & Texas Land Company so as to exclude stock of other persons from grazing on the land. This conflict of the testimony was within the province of the jury to decide, and we are not authorized to disturb their findings.

[3] The evidence conclusively shows that not later than 1879 or 1880 Captain Yale took possession of the Patton Plantation, and the force of the testimony of the witness Houston Williams, that to the best of his recollection he built the fence inclosing the land in controversy within three years after Yale took possession, is not, as contended by appellants, destroyed by his further statement that he cannot name the year in which the fence was built. The inability to accurately remember dates and the hesitancy under cross-examination, especially with illiterate witnesses, to name the exact date of a past occurrence, is a matter of common knowledge, and witnesses can frequently only fix the date of a past occurrence by stating how long before or after a known or fixed date the occurrence took place. The testimony of this witness was corroborated by other testimony, which we have before set out, and, as before said, we think the evidence is clearly sufficient to sustain the finding of the jury that the land was inclosed prior to October 29, 1884, when the coverture of Mrs. Lyne began.

The concurrent payment of taxes by the New York & Texas Land Company was sufficiently shown to entitle it to prescribe under the five years statute of limitation. From the conclusions above expressed it follows that in our opinion each of the findings of the jury in favor of appellee on the issues of limitation accruing under the possession of the New York & Texas Land Company is sustained by the evidence.

[4] We are also of opinion that the evidence sustains the findings of the jury in favor of appellee on the issue of limitation of ten years accruing under the possession of Gov. Hogg and the executors of his will as agents and tenants at will of appellee. The evidence shows that the subdivisions of the land made by Gov. Hogg were all inclosed in his pasture, and until the oil development began in 1916 were in his possession, and were used by him and his estate for pasturage purposes.

[5] Appellee testified:

"When I bought that property I bought it for oil strictly. It was a bad speculative venture at that time, at his invitation. I mean in the sporting phrase that it was a long shot—you had to wait a long time before anything came,

and then wait. After I bought it I visited the ground; that was just after I bought it, possibly a month or six weeks, or two months, the first time I went down there. I was Mr. Will Hogg's guest on that trip; we went from Houston down there together, at his invitation. I met Gov. Hogg down there. I think he was staying there then. The Governor himself pointed out the land I bought; he pointed it out as being my land, and recognized it then as mine. * * * After that I had a conversation with Gov. Hogg relative to that land, at Manitou, Colo.; he and I were both there; I think it was in 1905. It was in the summer of 1905—June or July or August; some of those months. I found out he was there, and I went to see him about the property. At that time the oil boom had kind of died down, and I was up in Denver, and I went to see him. He said it had died down, but it revived, and we talked over the general conditions of the field, etc., and we wound up by saying that it was there; that we would take care of it the same as his own—all the oil there was; he would take care of it, and hold it for me. When he said that I didn't object to it. I turned it over to him; I had all the time. I certainly did acquiesce and consent to what he was saying, and after that I didn't object to him in his lifetime, or to his executor or family after his death, using and enjoying my lot. I permitted and suffered them to do it. If any of them were ever holding it otherwise than for me, I didn't have any notice of it."

Mr. Will Hogg, one of the executors of Gov. Hogg's will, testified, in effect, that the possession of the land by the estate was at all times subservient to appellee's right and title thereto.

We cannot agree with the contention of appellants that under these facts the possession of the Hogg estate was not the possession of appellee. An express contract of lease or rental is not essential to the holding of possession by one person for another. Cobb v. Robertson, 99 Tex. 138, 144, 146, 86 S. W. 746, 87 S. W. 1148, 122 Am. St. Rep. 609; 1 Wood's Landlord and Tenant, 1. We adopt as a correct statement of the law upon this question the following paragraph of the trial court's charge:

"If one who has entered on land including a parcel claimed by another recognizes or acknowledges the title of the claimant to such parcel, and there is an understanding between them for the occupant to use or enjoy such parcel, holding same for such complainant, and the latter thereafter permits or suffers such occupant and those succeeding to his estate to so occupy such parcel, then they are estopped to deny such claimant's title to such parcel, and their possession of it, in law, is that of such claimant, for purposes of limitation."

[6] We do not think the finding of the jury in favor of appellee upon the issue of five years' limitation accruing under the occupancy of the land by the Hogg estate can be sustained, because there is not sufficient evidence of the payment of taxes by appel-

lee or by the Hogg estate for him during such occupancy. The evidence raises the issue of boundary submitted to the jury, and the finding of the jury upon that issue is not against the great weight and preponderance of the evidence. There was no error in the charge of the court submitting the several issues of limitation, and appellants' assignments complaining of the charge and of the refusal of the court to give special charges requested by them cannot be sustained.

It would serve no useful purpose to discuss any other of the 35 propositions based on the 113 assignments presented in appellants' brief. In view of our conclusions upon the questions before discussed, the remaining propositions advanced by appellants become immaterial.

It follows that none of the remaining assignments can be sustained, and that the judgment of the court below should be affirmed; and it has been so ordered.

Affirmed.